509 So.2d 178 (1987)
Kevin E. ELLITHORP
v.
Lisa S. ELLITHORP.
No. CA 86 0521.
Court of Appeal of Louisiana, First Circuit.
May 28, 1987.
*179 Sidney C. Sundbery, Houma, for plaintiff and appellee Kevin E. Ellithorp.
Keith M. Whipple, Houma, for defendant and appellant Lisa S. Ellithorp.
Before SAVOIE, CRAIN and JOHN S. COVINGTON, JJ.
JOHN S. COVINGTON, Judge.
Lisa A. Ellithorp, the former wife of Kevin E. Ellithorp, devolutively appealed the district court's judgment in Kevin's suit to partition the assets of the community of acquets and gains which formerly existed between them. The primary bone of contention which this case presents is how the proceeds of a personal injury settlement which Kevin received during the existence of the community for injuries sustained during that regime should be divided between the former spouses. The controversy has its genesis in Kevin's having deposited the net settlement proceeds into an existing community checking account which will be discussed in greater detail in this opinion.
Kevin filed suit for personal injuries sustained in a vehicular collision on December 29, 1981. The trial of that suit began on February 13, 1984 and after almost a day of trial the case was settled and the terms of the settlement were read into the record. La.C.C. art. 3071. The transcription of the terms of settlement, as well as Kevin and Lisa's acquiescence in it, as elicited by the trial judge's questions and their answers, is Kevin's Exhibit No. 2 in this partition suit. The settlement was for $360,000.00. Of that sum $358,000.00 was Kevin's; $100,000.00 was attributable to his pain and suffering and $258,000.00 represented loss of income, both past and future, from the date of injury through work life expectancy. Lisa received $1,000.00 for loss of consortium and the minor child received the same amount.
The record of the instant case reveals that the tortfeasor's insurer paid medical bills on behalf of Kevin in the approximate amount of $52,000.00 and "salary continuation" payments totaling $19,959.80 between January 2, 1982 and January 24, 1983. Additionally, the record shows that Kevin earned about $3,000.00 during the latter part of 1983 and the early part of 1984 for work performed for a pest control exterminating business. Neither the medical expenses nor the "salary continuation" was deducted from the $358,000.00 settlement.
Kevin's attorneys issued to Kevin their check for $248,057.24 on April 4, 1984, after deducting the attorney's fees and litigation expenses totaling $109,942.76. The settlement check was deposited into an existing community checking account which had a balance of $493.49 for the period ending March 19, 1984, the previous balance date for that account. Kevin issued three checks on that account, totaling $10,822.80, on April 6, 1984 to pay community debts at a bank and a finance company. On April 9, 1984, Kevin issued twelve checks on that community account, totaling $202,000.00 to purchase single premium annuities and a single premium life insurance policy. On April 10, 1984 Kevin issued a check on the community account to South Louisiana Bank for a $13,000.00 certificate of deposit and a check for $18,000.00 made payable to the order of "cash," which he used to open a checking account, designated "Mr. or Mrs. Kevin E. Ellithorp," to be used for the purpose of paying himself $1,500.00 per month for the next twelve months.
Kevin "cashed in" enough of the single premium annuities to produce a cash payment *180 of $28,935.00 necessary when the Ellithorps bought a residence on June 21, 1984, in which transaction they assumed the vendors' mortgage balance of $27,530.05.
Checks were issued by Kevin on the community account, replenished by his depositing $1,500.00 checks written periodically on the account he opened with the $18,000.00 deposited on April 10, 1984. He expended $4,500.00 of the funds from that latter account to purchase a motorcycle. Some checks were issued by Lisa on the community account, but with few exceptions, the checks were for small amounts written to grocers, utility suppliers and the like.

DISTRICT COURT
The trial court assigned oral reasons for apportioning the personal injury settlement, stating that West v. Ortego, 325 So.2d 242 (La.1975), Placide v. Placide, 408 So.2d 330 (La.App. 3d Cir.1981), La.R.S. 9:2801, "and the evidence produced" at the trial "served as a rational basis" for apportioning it. Because the trial court's method is instructive, we quote it as follows:
[I] first determined the appropriate percentage of general damages, that is, for the physical injury, pain and suffering to the total recovery. In this case, the plaintiff, herein, Mr. Ellithorp, recovered $358,000 of which $100,000 was in general damages. That proportion is 27.93%. I likewise apportioned the special damages, that is, for loss of past and future income to the total recovery, the total recovery again being $358,000, special damages totaling $258,000 yielding a percentage of 72.07%. I further apportioned the attorneys fees and expenses to the general damages. The attorneys fees and expenses totaled $109,942.76 and taking 27.93% of that sum, yields a total of $30,707.01 which is the apportionment of the attorneys fees and expenses to the general damages. I likewise apportioned the same attorneys fees and expenses to the special damages, that is, $109,972.76 and taking 72.07% of that yields attorneys fees for special damages of $79,235.75. To determine the net general damages received I took the $100,000, which was the general damage award, and reduced that by the amount of the attorneys fees apportioned to the net general damages which was $30,707.01 yielding general damages of $69,292.99 of all which is separate in accordance with Civil Code Article 2344. I likewise determined net special damages received by taking the $258,000 that was the netwhich was the gross special damages and reduced it by its proportionate sum of the attorneys fees and expenses of $79,235.75 which made the net special damages equal $178,764.25. This sum would be community property except for the fact that the community was terminated shortly after receiving these funds so, in fact, a portion of this ended up being community and a portion of it ended up being separate funds all in accordance with Civil Code Article 2344.
The Court had to again apportion this $178,762.25 between separate and community funds. In order to do this the Court computed that sum which was attributable to the gross loss of past income to the date of settlement. In order to do that we considered what Mr. Ellithorp's wages would have been from Otis Engineering Company through the date of settlement which would have been $68,000 and that is using the $32,000 of annual income that Mr. Ellithorp was earning at the time. I reduced that sum by the amount of the salary continuation checks that Sweco was paying Mr. Ellithorp during this period of time which sum amounted to $19,959.80 reducing that $68,000 gross income settlement figure to $48,040.20. I further reduced that sum by the $3,000 which he earned while working for Terminix reducing the sum to $45,040.20. I thereafter computed the expense and attorneys fees attributable to this gross loss past of income. And that is I took the total settlement figure of $358,000 and apportioned that sum to the $45,040.20 which gave me a percentage of 12.58106%. Then I took that percentage and allocated the total attorneys fees and expenses of $109,942.76 of that sum which is $13,831.96. I reduced the gross salary loss of $45,040.20 by this *181 allocation of attorneys fees and expenses of $13,831.46 which gave me a net loss of past income to date of settlement of $31,208.24, all of this sum being community property.
To determine the future loss of income applicable for the period of time from the date of settlement to the date of separation I again had to determine what funds were available which was the $258,000 in special damages less the $45,040.20 attributable to the income from the date of injury until the date of settlement and apportioned that over the balancereduced it rather. What I did was I reduced the $258,000 by that sum and proportioned the balance of that net special damage over the work life expectancy of Mr. Ellithorp which was forty-three years. I then derived an amortization schedule of 8% to determine what monthly income would be derived from that net special damages after reducing it by the gross salary loss. That sum is $1,470.00. I then multiplied that $1,470 by the six months in between the settlement date and the termination of the community yielding $8,820. I then reduced the $8,820 by the apportion of attorney fees and expenses that related to the special damage award of $258,000. That apportionate expense is 3.42%. The attorneys fees attributable to the special damages was $79,235.75 and I took 3.42% of that which is $2,708.75 which means that monthly income for that six month (sic) is reduced by the sum of $2,708.75 yielding $6,111.24 which is also community property. If you add the grossyou reduced the gross special damages of $258,000 by the amount of the attorneys fees $79,235.75, further reduce it by past loss of income of $31,208.24, and further reduce it by the future loss (sic) income of $6,111.25 you net out $141,444.76 which will also become his separate property.
In recap of the settlement funds the Court has determined that the net general damages of $69,292.99 as well as the special future damages which he received at $141,444.76 is Mr. Ellithorp's separate funds which total $210,737.75. The community consists of past lost wages of $31,208.24 and the future loss wages of $6,111.25 or a total of $37,319.49. If you add a separate figure of $210,737.75 to the community property of $37,319.49 plus the total attorneys fees and expenses of $109,942.76 you end up with a total settlement figure which Mr. Ellithorp received of $358,000.
The trial court declared that the motorcycle, residence, and single premium annuities "were paid for with separate funds of the plaintiff and therefore his separate property," relying on the rationale of Succession of Sonnier, 208 So.2d 562 (La.App. 3d Cir.1968) Succession of Russo, 246 So.2d 26 (La.App. 4th Cir.1971), writ refused, 247 So.2d 861 (La.1971). The court awarded the First National Bank of Houma certificate of deposit for $17,000.00 to Lisa and the South Louisiana Bank certificate of deposit for $13,000.00 to Kevin, subject to the pledge of both certificates in favor of South Louisiana Bank which held them as collateral for a loan made to one of Lisa's relatives. The court declared specified items of movable property to be either Kevin's or Lisa's, utilizing the numbers and values stated on Kevin's detailed descriptive list.
The characterization of funds as either community or separate, including the personal injury settlement proceeds which were deposited into the pre-existing community checking account and which quickly passed through it, was addressed by the trial court's taking into account the numerous bank statements and cancelled checks, as well as Kevin's lengthy request for admissions relating to deposits and expenditures. The court observed that the requests for admissions were not answered by Lisa and are deemed admitted, citing La.C.C.P. art. 1467.
The court found a beginning balance of $493.49 in the community account before the personal injury settlement check was deposited. He added deposits made to that account and subtracted community withdrawals and concluded Kevin obtained "a net figure of approximately $10,000 of community funds."

*182 ASSIGNMENTS OF ERROR
Lisa's lone assignment of error addresses the trial court's finding that the personal injury settlement proceeds of $248.057.24 which were deposited into the community checking account was Kevin's separate property.

ISSUE
Appellant states the issue to be whether the proceeds "deposited to a community account and used indiscriminately by the parties, became community."
Appellee timely answered appellant's devolutive appeal but did not brief the alleged errors complained of in the answer to the appeal and for that reason, those assignments are deemed abandoned.

DISCUSSION
Lisa filed for separation on August 17, 1984 and a judgment of separation was rendered in that proceeding. Thus, the community was terminated on August 17, 1984.
Damages for personal injuries constitute separate property of the injured spouse. La.C.C. art. 2344. Damages to compensate for diminished earning capacity, also known as future loss of earnings, constitute the injured spouse's separate property to the extent the "future loss" is deemed to be attributable to a time after termination of the community property regime.
In determining what part of the net loss of earnings proceeds was attributable to the community regime, the trial court determined the amount Kevin would have earned, at the stipulated rate of $32,000.00 per annum from December 29, 1981 to February 13, 1984, and subtracted therefrom the "salary continuation" payments totaling $19,959.80 and earned salary of $3,000.00, and determined that $31,208.24 of the net future loss of wages ($178,764.25) for the period beginning December 29, 1981 and ending February 13, 1984, was community property. The court further determined that the net "future loss of income" for the period commencing February 13, 1984, the date of the settlement, and ending August 17, 1984, When Lisa filed for separation, totaled $6,111.24 and was also community property.
Thus, the trial court held that the net settlement proceeds owned by Kevin separately consisted of post-community future loss of income amounting to $141,444.76 and net general damages amounting to $69,292.99, and that property purchased with those funds retained its separate character.
Our review of the record as a whole fails to reveal that the trial court was manifestly erroneous in holding the funds received in the settlement consisted of both Kevin's separate property and Kevin and Lisa's community property by uncommingling the settlement funds from the exceedingly sparse community funds in the community checking account. In the absence of manifest error on the part of the trial court, we must affirm. Arceneauz v. Domingue, 365 So.2d 1330 (La.1978). In the instant case the record overwhelmingly supports the trial court's findings of fact and conclusions of law.
Accordingly, appellant's assignment of error is without merit. The judgment of the trial court is affirmed at appellant's cost.
AFFIRMED.